Date signed October 10, 2008



THOMAS J. CATLIOTA
U. S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Greenbelt

| | | |
|---|---|---|
| In re: | * | |
| Mattress Discounters Corporation, | * | 08-21642-TJC |
| and | * | |
| Mattress Discounters Corporation East, | * | 08-21644-TJC |
| | * | |
| | * | |
| Debtors | * | Jointly Administered under |
| | * | 08-21642-TJC |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### MEMORANDUM OF DECISION

Before the Court is the motion by the debtors, Mattress Discounters Corporation and

Mattress Discounters Corporation East (the "Debtors"), to adopt their prepetition severance plan

covering eligible, nonunion employees, with certain modifications intended to reflect various

bankruptcy concerns (the "Plan"). The Official Committee of Unsecured Creditors (the

"Committee") and the Office of the United States Trustee object to the motion.  From the outset

of this case, the Debtors' reorganization strategy has been to liquidate and close immediately all

of its stores in the New England area, while focusing its reorganization or sale efforts on its

stores in the Mid-Atlantic area.  In the motion, the Debtors seek to adopt the Plan for all eligible

1

employees and, in particular, so that they can make severance payments to their New England employees who have been and are being terminated as a result of the Debtors' exit from the New England market.  The Debtors' rationale for making the severance payments to the New England employees is that they need to retain their Mid-Atlantic workforce to achieve a successful reorganization, and the Mid-Atlantic employees will be comforted by the payment to the New England employees.

The Court held an initial hearing on the motion on September 12, 2008, and a final hearing on October 6, 2008.  For the reasons set forth herein, the Court accepts the Debtors' determinations that the retention of the Mid-Atlantic employees is crucial to their reorganization effort and that the adoption of a severance plan is a necessary component of that retention objective.  The Court, however, concludes that making severance payments to the New England employees will not further that objective.  Accordingly, the Court will not authorize the Debtors to adopt the Plan for the New England employees.  The Court, however, will authorize the Debtors to adopt the Plan for their Mid-Atlantic employees, thereby aligning the Plan with the Debtors' objective of retaining the Mid-Atlantic employees.

## I.  FINDINGS OF FACT

On September 10, 2008 (the "Petition Date"), the Debtors filed petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").  The Debtors remain in possession of their assets and continue to manage their business as debtors in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.[1]

---

[1] Debtor Mattress Discounters Corporation East is a non-operating holding company and substantially all its assets consist of its ownership of the stock of the Debtor Mattress Discounters Corporation, which in turn owns substantially all of the operating assets of the Debtors.

2

The Debtors are retailers of mattresses and other bedding products.  As of the Petition Date, the Debtors operated approximately 140 retail stores located in six states, with a concentration in the Mid-Atlantic region (approximately 90 stores in Delaware, the District of Columbia, Maryland and Virginia) and the New England region (approximately 50 stores in Massachusetts, New Hampshire and Rhode Island).  The Debtors also operate warehouses in each of their market areas and operate a factory located in Maryland at which the Debtors manufacture mattresses under a private label.  The Debtors have been in business for thirty years.

As of the Petition Date, the Debtors employed approximately 475 full- and part-time employees, with approximately 400 individuals employed in various aspects of the retail operations, approximately 30 individuals employed in various aspects of the manufacturing operations and approximately 45 individuals employed in the Debtors' corporate headquarters located in Upper Marlboro, Maryland.

In 2007, the Debtors had gross revenue of approximately $122 million.  According to the Debtors, the retail mattress and bedding industry is experiencing a downturn, similar to other segments of the retail industry.  As a result of the industry downturn, combined with increasing competition and a weakened overall economy, the Debtors have experienced a significant decline in sales.

The financial performance of the Debtors' stores in the New England region has been particularly weak.  The Debtors report that in 2007, its stores in New England suffered an aggregate loss of approximately $1.5 million and that, as of the Petition Date, the Debtors' New England region had suffered an aggregate year-to-date loss in 2008 of approximately $2.9 million.

The Debtors sought Chapter 11 protection for the stated purpose of effectuating a turnaround plan.  The Debtors, in agreement with its postpetition secured lender and with the consent of the Committee and the U.S. Trustee, are on a very tight and fast-paced timetable in this case.  For example, in the absence of a sale of the Debtors' business, it is an event of default under the Debtors' postpetition financing arrangement if the Debtors fail to file a disclosure statement by November 7, 2008, or fail to obtain plan confirmation by December 30, 2008. Further, there is no disagreement among the parties at this stage of the proceeding that there may not be much in the way of a distribution to general unsecured creditors in this case and the Debtors' resources must be carefully shepherded.

The Debtors' turnaround plan includes the prompt exit from the New England region and a focus on reorganizing or selling the Mid-Atlantic operations. To that end, shortly after the Petition Date, the Court authorized the Debtors to close their New England operations.  Since that time, the Debtors have closed 42 of their 50 New England stores.  The Debtors are in discussions to sell the remaining New England stores and anticipate selling them in the next several weeks.  If the store sales do not materialize, the Debtors will close any stores that are not sold.   During this process, the Debtors have terminated approximately 70 of their New England employees.  The Debtors anticipate that the remaining New England employees will be retained by the prospective purchasers of the stores; any employees who are not retained will be terminated.  The Debtors have not closed any stores in the Mid-Atlantic area since the Petition Date.

In 2000, the Debtors adopted a severance pay plan covering eligible nonunion employees. Since then, each year, the Debtors' attorneys review the prior version of the severance pay plan to make sure it complies with any changes in the law, and the Debtors adopt a restatement of the

4

plan for the given year.  The core of the plan, however, has remained essentially the same since 2000. [2]

The Debtors adopted the current restatement of the severance pay plan in January 2008. It classifies eligible employees by seven categories or positions, and pays a severance benefit based on years of service.  Specifically, eligible employees are entitled to a severance benefit equal to the number of weeks of base pay (as defined in the plan) set forth on the following table:

| Classification | Less Than 12 Months of Employment | 12 Months or More of Employment | Maximum Weeks of Service for Severance Calculation |
|---|---|---|---|
| Non-Exempt | 1 week | 1 week plus 1 week per year of service | 11 weeks |
| Exempt | 2 weeks | 2 weeks plus 1 week per year of service | 12 weeks |
| Manager | 2 weeks | 2 weeks plus 1.5 weeks per year of service | 17 weeks |
| Director or equivalent | 2 weeks | 2 weeks plus 2 weeks per year of service | 22 weeks |
| Vice President or equivalent | 26 weeks | 26 weeks | 26 weeks |
| Chief Financial Officer | 26 weeks | 26 weeks | 26 weeks |
| Chief Executive Officer | 52 weeks | 52 weeks | 52 weeks |

---

[2] On October 23, 2002, the Debtors filed a Chapter 11 petition in this Court, Case No. 02-22330.  That case resulted in a confirmed plan of reorganization.  The docket in that case reflects that the Debtors filed on November 13, 2002, a motion for authority to adopt and implement the severance plan post-petition, (Docket No. 151 in Case No. 02-22330), and the motion was granted, apparently without objection, by order dated December 6, 2008. (Docket No. 287 in Case No. 02-22330).

Severance benefits are paid on a periodic basis on the same date and in the same amounts as the employees would receive if they had not been terminated.  In order to receive the severance benefit, the employee must execute a release of all claims or lawsuits against the Debtors.  A severance benefit is not paid to an employee who resigns or quits, who is terminated for gross misconduct, or who is offered comparable employment by an employer that buys assets from the Debtors.

The Plan which the Debtors seek to adopt in this case is the 2008 restatement of the severance pay plan, described above, with the following modifications intended to address various bankruptcy concerns:

- The Debtors shall not be authorized to pay any severance benefits not permitted under §503(c) of the Bankruptcy Code;

- The Debtors shall only be authorized to pay severance benefits up to an amount that is consistent with the budget approved in connection with the Debtors' postpetition financing;

- The Debtors shall have no obligation to pay severance benefits to any employee who accepts employment with any other employer during the one-month period following the termination of such employee's employment with the Debtors;

- The Debtors' severance benefits shall not be paid as an administrative expense in the event the Debtors' Chapter 11 cases are converted to Chapter 7; and

- The Debtors shall provide to their postpetition secured lender, the Office of the United States Trustee and the Official Committee of Unsecured Creditors a monthly report (due on the 15th day following the end of each calendar month) detailing all severance paid by the Debtors.

The Debtors' President and Chief Executive Officer, Stephen Newton, testified that the severance benefits that would be paid under the plan to the New England employees would total $670,000 if all employees receive such benefits.  He estimates that the actual cost will be

6

between $200,000 and $300,000 depending on how many eligible employees actually qualify for benefits under the Plan.

The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## II. CONCLUSIONS OF LAW

The Debtors submit that the adoption of the Plan is an action taken outside the ordinary course of its business.  They contend that this is an appropriate action under the business judgment test applied to such actions pursuant to §363 of the Bankruptcy Code.  The Committee and the other objecting parties do not dispute that the applicable standard is whether the adoption of the severance plan is a proper exercise of the Debtors' sound business judgment.  They contend, however, that in the circumstances of this case, the Debtors have not met that standard.

"In the chapter 11 context, . . . the extent to which courts have adhered to the business judgment rule has varied according to the nature and significance of th[e] decisions" of trustees and debtors in possession.  7 *Collier on Bankruptcy* ¶ 1108.07 (15th Ed. Revised 2008).

> In the nonbankruptcy corporate law context, the business judgment rule is typically invoked after-the-fact, when an allegedly improvident management decision has already been made and put into effect.  In those cases, the courts concern themselves with the process by which the decision was made, not the wisdom or consequences of a decision that in retrospect turned out to be wrong.  In contrast, in chapter 11, the business judgment rule is often invoked *before*-the-fact, when a trustee or debtor in possession proposes to undertake a transaction that is, or is alleged to be, outside the ordinary course of business, or one that by statute requires court authorization . . . .  In these cases, the courts are, understandably, not only concerned with the process by which the decisions were made, but also with the effect the business decision will have on the estate and the chapter 11 process.

*Id.*, ¶ 1108.07 [2] (citations omitted; emphasis in original).

7

To satisfy §363(b) of the Code, "there must be some articulated business justification . . . for using, selling or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under section 363(b)." *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp)*, 722 F.2d 1063, 1070-1071 (2d Cir. 1983). This rule "requires that a judge determining a §363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application." *Id. See also U.S. ex rel. Rahman v. Oncology Associates, P.C.*, 269 B.R. 139, 161 (D.Md. 2001) (ruling that the "standard to be applied by a court in determining whether or not to approve the disposition of property is whether the trustee exercised sound business judgment" and that the court must determine "whether a 'sound business reason' exists for such action")(quoting *In re Lionel Corp.*), *judgment aff'd sub nom. U.S. ex rel. Colkitt*, 61 Fed. Appx. 860 (4th Cir. 2003).

In *In re Integrated Resources*, the court, after stating the general nature of the presumption afforded by the business judgment rule, listed specific elements of the rule.[3] "The business judgment rule's presumption shields corporate decision-makers and their decisions from judicial second-guessing when the following elements are present: (1) a business decision, (2) disinterestedness, (3) due care, (4) good faith, and (5) according to some courts and commentators, no abuse of discretion or waste of corporate assets." *Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992). And a recent case provides further elaboration of what bankruptcy courts look for in determining whether proposed actions satisfy the "sound business judgment" standard. These considerations include, *inter alia*: "Is there a reasonable relationship

---

[3] The Debtors cite this case solely for the general statement of the business judgment rule. *See* Debtors' Memorandum in Support of Request for Authority to Honor Obligations Under Modified Severance Pay Plan (#174) at pp. 7-8.

between the [action] proposed and the results to be obtained?"  and "Is the cost of the [action] reasonable in the context of the debtor's assets, liabilities and earning potential?"  *In re Dana Corp.*, 358 B.R. 567, 576 (Bankr. S.D.N.Y. 2006) (citations omitted).

In support of the motion, Mr. Newton testified that, since the bankruptcy filing, many of the Debtors' Mid-Atlantic employees have been the target of recruitment efforts by the Debtors' competitors.  He further testified that the Debtors have determined that it is essential to a successful reorganization effort for the Debtors to retain their Mid-Atlantic employees, and that retention of these employees will maximize the value of the Debtors' estates whether the Debtors are sold through this proceeding or reorganized under a traditional plan of reorganization. After discussions with many employees, managers and others, the Debtors have concluded that protecting the severance benefits for the Mid-Atlantic employees will provide an integral incentive for retaining those employees.

The Court accepts Mr. Newton's testimony and concludes that retaining the Mid-Atlantic employees is essential to maximizing the value of the Debtors' estates.  The Court further concludes that adopting the Plan with respect to the Mid-Atlantic employees will further that objective and is in the sound business judgment of the Debtors.  Accordingly, the Court will authorize the Debtors to adopt the Plan for the Mid-Atlantic employees.

The question is far more troubling with respect to the New England employees.  Most of those employees have been terminated; the remainder will either be terminated by the Debtors or retained by the prospective purchasers of the Debtors' remaining New England stores.  The Debtors do not, and cannot, proffer a business justification for adopting the Plan for the New England employees based on any perceived benefit to its New England operations or the enhancement of any New England stores.

9

Instead, the Debtors contend that paying severance payments to the New England employees will provide comfort to the Mid-Atlantic employees that severance benefits will be protected in bankruptcy.  While the Court does not question the Debtors' stated business motive, the Court has little doubt that the Debtors also have a benevolent, non-business motive for seeking to pay severance benefits to the New England employees.  The harsh realities of bankruptcy, however, require the Court to determine whether the Debtors' stated purpose equates to "sound business judgment."

The Court concludes that there is no reasonable relationship between paying severance benefits to New England employees and the Debtors' objective of retaining the Mid-Atlantic employees. The Court is authorizing the Debtors to adopt the Plan for the Mid-Atlantic employees.  That action addresses the Debtors' objective directly – the Mid-Atlantic employees will be aware that the Debtors have sought and obtained approval of this Court to adopt the Plan. Whether the Plan is adopted for the New England employees, or whether they are paid severance benefits under the Plan, has no bearing on the treatment of the Mid-Atlantic employees under the Plan.  If anything, from the purely economic perspective of the Mid-Atlantic employees, the payment of severance benefits to the New England employees would have the effect of diminishing funds from the estate that would otherwise be available in the reorganization process.  Accordingly, the Court finds and concludes that the adoption of the Plan for the New England employees does not meet the sound business judgment standard that applies to proposed actions under §363 of the Bankruptcy Code.

Finally, the Court notes that it is not addressing here whether, or to what extent, the New England employees are entitled to receive severance benefits under the Debtors' prepetition

10

severance plan. That issue will be addressed as appropriate, if and when any such claims are filed.

### III.    CONCLUSION

For the foregoing reasons, the Court authorizes the Debtors to adopt the Plan as it applies to the Mid-Atlantic employees.  The Court does not authorize the Debtors to adopt the Plan as it applies to the New England employees.


Copies to:

C. Kevin Kobbe
DLA Piper LLP
The Marbury Building
6225 Smith Avenue
Baltimore, MD 21209-3600

Clifford A. Katz, Esquire
Platzer, Swergold, Karlin, Levine,
Goldberg & Jaslow, LLP
1065 Avenue of the Americas, 18th Floor
New York, NY 10018

Bradford F. Englander
Linowes and Blocher, LLP
7200 Wisconsin Avenue, Suite 800
Bethesda, MD 20814-4842

Julia Frost-Davies
Andrew J. Gallo
Bingham McCutchen, LLP
One Federal Street
Boston, MA 02110

Jeffrey L. Tarkenton
Womble Carlyle Sandridge
& Rice PPLC
1401 Eye Street, N.W.
Washington, DC 20005

Deborah H. Devan, Esquire
Neuberger, Quinn, Gielen, Rubin &
Gibber, PA

One South Street, 27th Floor
Baltimore, MD 21202-3282

Dennis T. Lewandowski
Kaufman & Canoles, PC
150 West Main Street, Suite 2100
Norfolk, VA 23510

Maria Ellena Chavez-Ruark
Catherine K. Hopkin
Tydings & Rosenberg LLP
100 East Pratt Street, 26th Floor
Baltimore, Maryland 21202

Lynn Kohen, Esq.
Office of the United States Trustee
W. Clarkson McDow, Jr.
6305 Ivy Lane, Suite 600
Greenbelt, MD 20770

**END OF MEMORANDUM**