UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division)

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| MATTRESS DISCOUNTERS | ) | |
|    CORPORATION | ) | Case Nos. 08-21642-TJC |
|    and | ) | and 08-21644-TJC |
| MATTRESS DISCOUNTERS | ) | |
|    CORPORATION EAST, | ) | (Jointly Administered Under |
| | ) | Case No. 08-21642-TJC) |
|               Debtors. | ) | |
| | ) | |

**MOTION OF DEBTORS FOR ORDER (I) APPROVING SALE
OF MID-ATLANTIC ASSETS FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS, (II) AUTHORIZING
ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND
UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF**

Mattress Discounters Corporation ("**Mattress Discounters**") and Mattress Discounters

Corporation East ("**MDCE**"), the debtors and debtors in possession herein (collectively,

the "**Debtors**"), by their undersigned counsel, hereby file this motion (the "**Motion**") for entry of

an order (i) approving the sale of substantially all of the assets relating to the Debtors' business

operations in the Mid-Atlantic region free and clear of liens, claims, encumbrances and other

interests, (ii) authorizing the assumption and assignment of certain executory contracts and

unexpired leases, and (iii) granting related relief.

**Jurisdiction and Background Regarding Bankruptcy Proceedings**

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and

1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper pursuant to

28 U.S.C. §§ 1408 and 1409.

2.      On September 10, 2008 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**").

3.      The Debtors remain in possession of their assets and continue to manage their businesses as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

## The Debtors' Business Operations

4.      The Debtors are a leading retailer of mattresses and other bedding products.  As of the Petition Date, the Debtors operated approximately 140 retail stores located in seven states, with a concentration in the Mid-Atlantic region (approximately 90 stores in Delaware, the District of Columbia, Maryland and Virginia) and the New England region (approximately 50 stores in Massachusetts, New Hampshire and Rhode Island).  The Debtors also operate a factory located in Maryland at which the Debtors manufacture mattresses under the private label Factory Direct Comfort Source® for sale in their retail stores.  The Debtors have been in business for thirty years, and their jingle "*Have a good night's sleep on us*" is widely recognized in the markets in which they operate.

5.      As of the Petition Date, the Debtors employed approximately 475 full-time and part-time employees, with approximately 400 individuals employed in various aspects of the retail operations, approximately 30 individuals employed in various aspects of the manufacturing operations and approximately 45 individuals employed in the Debtor's corporate headquarters located in Upper Marlboro, Maryland.

6.      In 2007, the Debtors had gross revenue of approximately $122 million, earnings before interest, taxes, depreciation and amortization of approximately $2 million and a net loss of approximately $3 million.  For the first two quarters of 2008, the Debtors had gross revenue of

approximately $49 million, earnings before interest, taxes, depreciation and amortization of approximately negative $5 million and a net loss of approximately $8 million.

7.    All of the Debtors' retail stores are subject to leases.  In addition, the Debtors lease their Maryland headquarters and warehouse facility, their Maryland factory facility and a Massachusetts warehouse facility.

8.    Substantially all of the Debtors' business operations are conducted by, and substantially all of their assets are held by, Mattress Discounters, a Maryland corporation. MDCE, a Delaware corporation, is a non-operating holding company, and substantially all its assets consist of its ownership of the stock of Mattress Discounters.

### Events Leading to Bankruptcy

9.    Like other segments of the retail industry, the retail mattress and bedding industry is experiencing a downturn.  As a result of the industry downturn, combined with increasing competition and a weakened overall economy, the Debtors have experienced a significant decline in sales.  2008, in particular, has been difficult for the Debtors, as in each month of 2008 the Debtors have experienced a decline in year-over-year sales as compared to 2007.  The financial performance of the Debtors' stores in the New England region has been particularly weak.  In 2007, the Debtors' New England region suffered an aggregate loss of approximately $1.5 million.  As of August 2008 (the month prior to the bankruptcy filings), the Debtors' New England region had suffered an aggregate year-to-date loss of approximately $2.9 million.

10.    Given their financial performance, the Debtors were not able to stay current on their obligations to vendors and certain landlords.  In addition, prior to the bankruptcy filings, the Debtors defaulted on certain of their covenant obligations to their secured lender.

11.     In response to these challenging conditions, the Debtors sought Chapter 11 protection for the purpose of effectuating a turnaround plan.  The turnaround plan originally included the prompt exit from the New England region (which has been accomplished) and targeted reductions of the Debtors' retail operations in the Mid-Atlantic region.  In recent weeks, however, it has become apparent that the Debtors will not have the ability to obtain exit financing necessary for a plan of reorganization.  Accordingly, the Debtors have aggressively pursued a prompt sale of substantially all of their assets.

<u>**The Sale of the Mid-Atlantic Assets**</u>

12.     The Debtors have been pursuing a sale of their assets for approximately two years.  During this period of time, the Debtors have conducted detailed negotiations with numerous potential purchasers and have on one occasion fully documented a sale transaction only to have it collapse prior to settlement.

13.     In the weeks leading to the Petition Date, and continuing during the post-petition period, the Debtors' pursuit of a sale has intensified.  The Debtors' objective has been to identify a suitable stalking horse purchaser such that the Debtors will be able to establish a floor for competitive bidding and have a potential to realize enterprise value.  The process has been enormously challenging.

14.     As the court is aware, the Debtors' Chapter 11 cases have proceeded against the backdrop of a global financial crisis that has created unprecedented difficulties for retailers.  Given the market conditions, very few potential purchasers are willing at this time to even consider significant investment in a financially distressed retail business.  Other factors have also made the sale process challenging.  Among other things, the Debtors' sales have significantly deteriorated during the post-petition period, and the Debtors have dealt with continuing liquidity

issues because vendors have refused to provide financing terms.  Furthermore, the Debtors'
post-petition lender has imposed strict financing conditions and has required that the bankruptcy
cases be conducted on an expedited track.

15.    Despite these challenges, the Debtors have been able to conclude negotiations for
a sale of their Mid-Atlantic assets.  In particular, the Debtors have entered into an Asset Purchase
Agreement dated November 7, 2008 (the "**Purchase Agreement**") with RoomStore, Inc., on
behalf of an entity to be formed and designated by RoomStore, Inc. (the "**Purchaser**"), pursuant
to which the Purchaser has agreed to purchase substantially all of the assets relating to the
Debtors' business operations in the Mid-Atlantic region (as described in detail in the Purchase
Agreement, the "**Assets**").  A copy of the Purchase Agreement is attached hereto as **Exhibit 1**.

16.    The Purchase Agreement is the result of extensive arm's length negotiations with
the Purchaser that were conducted over a period of more than two months.  Below is a brief
summary of select terms of the Purchase Agreement:

| Term | Brief Summary |
|---|---|
| **Assets to be Sold** | "Assets" is defined to include substantially all of the Debtors' assets used in connection with their business in the Mid-Atlantic region, including inventory, contracts, leases, intellectual property and all tangible and intangible personal property. |
| **Excluded Assets** | "Excluded Assets" is defined to include the Debtors' cash and cash equivalents, accounts receivable, avoidance actions (except avoidance actions against non-debtor parties to the contracts and leases assigned to the Purchaser), tax refunds and security deposits (except those under leases to be transferred to the Purchaser). |
| **"As Is" Sale** | The assets are to be conveyed to and accepted by Purchaser on an "as is," "where is" and "with all faults" basis, free of any warranties or representations whatsoever, whether express or implied, except as expressly set forth in the Purchase Agreement. |

- 5 -

| Consideration | The purchaser price consists of: (i) the assumption by the Purchaser of certain liabilities of the Debtors (including the obligation to pay an amount not to exceed $500,000 for cure costs under the leases to be assumed and assigned to the Purchaser); and (ii) $4 million, subject to various adjustments (including a dollar for dollar adjustment if the Debtors' inventory has a value of less than $4 million as of the date of closing. Five percent (5%) of the cash portion of the purchaser price is to be paid as a deposit; eighty percent (80%) of the cash portion of the purchase price is to be paid at closing; and the remaining fifteen percent (15%) of the cash portion of the purchase price is to be paid within 45 days of closing. |
|---|---|
| **Assumption/Assignment of Designated Contracts and Designated Leases** | The Debtors shall assume and assign to the Purchaser the "Designated Contracts" and the "Designated Leases" identified in schedules attached to the Purchase Agreement. The Purchase has the right to "de-designate" any of the "Designated Contracts" and "Designated Leases" at any time prior to the closing. The Purchaser has agreed to pay an amount not to exceed $500,000 for cure costs under the Designated Leases. To the extent cure costs under the Designated Leases exceed $500,000, the amount in excess of $500,000 shall be paid by the Debtors. The Debtors, however, shall have no obligation to pay any cure costs under the Designated Contracts. |
| **Break-Up Fee** | The Purchaser shall be entitled to a Break-Up Fee in the amount of $250,000 upon the occurrence of certain conditions set forth in the Purchase Agreement, including in the event the Debtors sell the Assets to a competing bidder or in the event the Debtors pursue a plan alternative as set forth in Section 6.2 of the Purchase Agreement. |

17.     The foregoing is only a brief summary. The terms of the sale of the Assets are set forth in detail in the attached Purchase Agreement. **In the event of any inconsistency between the above summary and the Purchase Agreement, the terms of the Purchase Agreement shall control. Interested parties should review the Purchase Agreement for a complete and accurate understanding of the terms of the sale of the Assets.**

**Relief Requested**

18.     The Debtors believe that the sale of the Assets is in the best interests of their estates and creditors.  Accordingly, by this Motion, the Debtors seek entry of an order, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure, (i) approving the sale of the Assets free and clear of liens, claims, encumbrances and other interests, (ii) authorizing the assumption and assignment of the Designated Contracts and Designated Leases, and (iii) granting related relief.

19.     The Debtors wish to conclude the sale of the Assets as expeditiously as possible. At the same time, however, the Debtors wish to ensure that all financially qualified interested parties are provided a reasonable opportunity to submit competing bids so the estate receives the maximum return on the sale of the Assets.   Accordingly, by separate motion filed contemporaneously herewith, the Debtors are seeking entry of an order approving procedures for the submission of higher and better offers.

**Basis for Relief**

A.     **The sale of the Assets is in the best interests of the Debtors' estates.**

20.     Section 363(b) of the Bankruptcy Code requires court approval for the use, sale or lease of a debtor's assets outside the ordinary course of business.  In particular, Section 363(b)(1) provides that the debtor, "after notice and a hearing, may use, sell, or lease other than in the ordinary course of business, property of the estate[.]"  11 U.S.C. § 363(b)(1).  A court should approve the sale of assets outside of the ordinary course of business if the proposed sale is supported by the debtor's exercise of reasonable business judgment.  *See, e.g.*, *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991)); *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070

(2d Cir. 1983).  *See also U.S. ex rel. Rahman v. Oncology Assocs., P.C.*, 269 B.R. 139, 161 (D. Md. 2001) (recognizing that "[t]he standard to be applied by a court in determining whether or not to approve the disposition of property is whether the trustee exercised sound business judgment") (citing *Lionel Corp.*); *In re Naron & Wagner, Chartered*, 88 B.R. 85, 87-88 (Bankr. D. Md. 1988) (citing *Lionel Corp.*).

21.     Absent a significant infusion of liquidity, the Debtors cannot continue to operate their business as a going concern.  Given their circumstances, a sale of the Assets is the best available option.   As indicated above, the Debtors aggressively marketed the assets over an extended period of time during which they conducted extensive discussions and negotiations with numerous interested parties.  The sale proposed herein represents the highest and best offer the Debtors have received.

22.     The Debtors' estates will receive significant benefits from the sale of the Assets, including the receipt of cash and the elimination of rejection damage claims.  In addition, the Purchase Agreement establishes a floor for the purchase price and creates the possibility that a higher and better offer will be received through the bidding and auction process.  Given the circumstances, the sale of the Assets is in the best interests of the estates and should be approved.

**B.     The Court should approve the sale of the Assets free and clear of liens, claims, encumbrances and other interests.**

23.     Pursuant to Section 363(f) of the Bankruptcy Code, a debtor may sell property "free and clear of any interest in such property of an entity other than the estate" if any of the following conditions is satisfied:

> (a)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (b)     such entity [holding an interest] consents;

(c)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on the property;

(d)     such interest is in bona fide dispute; or

(e)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). *See WBQ Partnership v. Virginia Dep't of Medical Assistance Services (In re WBQ Partnership)*, 189 B.R. 97, 101 (Bankr. E.D. Va. 1995) (noting that Section 363(f) is written in the disjunctive and requires that only one of the conditions present be met). *See also In re P.K.R. Convalescent Centers., Inc.*, 189 B.R. 90, 93-94 (Bankr. E.D. Va. 1995) (Section 363 addresses sales free and clear of any interest, not just liens). Furthermore, Section 105(a) of the Bankruptcy Code, which empowers bankruptcy courts to enter "any order, process, or judgment that is necessary or appropriate" to carry out the provisions of the Bankruptcy Code, permits a court to authorize the sale of a debtor's assets free and clear of any liens, claims, encumbrances and other interests. *See, e.g.*, *In re White Motor Credit Corp.*, 75 B.R. 944, 948-49 (Bankr. N.D. Ohio 1987).

24.     Here, the Debtors believe there are no liens on the Assets other than any lien in favor of the Debtors' pre-petition secured lenders, which have consented to the sale of the Assets. Accordingly, the requirements of Section 363(f) will be satisfied, and the Court should approve the sale of the Assets free and clear of all liens claims, encumbrances and other interests, and any liens shall attach only to the proceeds of the sale in the order of their priorities, subject to the rights and defenses, if any, of the Debtors and other parties in interest with respect thereto.

C. **The assumption and assignment of the Designated Contracts and the Designated Leases is a sound exercise of the Debtors' business judgment.**

25.     As part of the relief requested herein, the Debtors seek authority to assume and assign to the Purchaser the Designated Contracts and the Designated Leases, which assumption and assignment shall be effective only upon (a) the closing of the sale of the Assets to the Purchaser and (b) the payment of all amounts necessary to cure any defaults under the Designated Contracts and the Designated Leases (or, in the case of an unresolved objection to a cure amount, the escrowing of an amount equal to the cure amount asserted by the objecting party or such lower amount as may be fixed by the Court).

26.     The Debtors are requesting that the order granting this Motion provide that, upon the assumption and assignment of the Designated Contracts and the Designated Leases to the Purchaser and the payment of all amounts necessary to cure any defaults under the Leases, the Designated Contracts and the Designated Leases shall be valid, binding and enforceable in accordance with their respective terms, excluding and notwithstanding any provision in any of the Designated Contracts and the Designated Leases that may in any way prohibit, restrict or condition their assignment to the Purchaser.  Without limiting the generality of the foregoing, and notwithstanding any provision to the contrary in any of the Designated Leases and/or in any statute or governing law, the Debtors request that the Purchaser be permitted to (a) operate the assigned leased premises consistent with the Purchaser's use as a retail store, (b) operate the assigned leased premises under the trade name of its choosing, (c) perform non-structural or minor structural interior alterations and remodeling of the assigned leased premises without further consent of any person or party to the extent necessary to conform the layout of the premises to that of a typical retail store consistent with the Purchaser's use, (d) erect its

customary and typical building façade signage (it being understood that the height of the channel letters of such signage shall in no event be less than the height of the channel letters of the Debtors' current signage) and insert its customary and typical signage on any shopping center multi-panel pylon sign in place of any such sign of the Debtors (it being understood that the size of the space on the pylon for such signage shall be equal to the size of the space allocated to the Debtors' current signage, if any), and (e) remain "dark" with respect to the assigned leased premises for up to an additional one hundred twenty (120) days after assignment to complete such alterations and remodeling as the Purchaser deems necessary or appropriate.

27.     The Debtors are also requesting that the order granting this Motion require that the non-debtor parties to the Designated Leases cooperate and expeditiously execute and deliver, upon the reasonable requests of the Purchaser, and not charge the Purchaser for, any instruments, applications, consents or other documents that may be required by any public or quasi-public authority or other party or entity, for the purpose of obtaining any permits, approvals or other necessary documents required for alteration, installation of signage, opening and/or operating of the assigned leased premises.

28.     Pursuant to Section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject an executory contract or unexpired lease."  11 U.S.C. § 365(a).  The assumption or rejection of an executory contract or unexpired lease is subject to judicial review under the business judgment standard.  If a debtor's business judgment has been reasonably exercised, the court should approve the proposed assumption or rejection.  *See, e.g., NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 523 (1984).

29.     A debtor's decision to assume or reject an executory contract or unexpired lease should be approved "except upon a finding of bad faith or gross abuse of the [debtor's] business

discretion." *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1985), *cert. denied*, 475 U.S. 1057 (1986). This standard is very "lenient" and courts should routinely defer to the debtor's decision. *In re Dunes Hotel Assocs.*, 194 B.R. 967, 988 (Bankr. D.S.C. 1995). *See also In re Federal Mogul Global, Inc.*, 293 B.R. 124, 126 (D. Del. 2003) (holding that the business judgment standard mandates that the debtor's decision to assume or reject a lease be approved unless the decision is the product of bad faith, whim or caprice). "More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control the case impartially." *Richmond Leasing v. Capital Bank, N.A.*, 762 F.2d. 1303, 1311 (5th Cir. 1985).

30.     Here, the Designated Contracts and the Designated Leases are a vital component of the Assets and, as a result, the reasons that support the sale of the Assets also support the assumption and assignment of the Designated Contracts and the Designated Leases. In short, the Debtors have exercised sound business judgment in deciding to assume and assign the Designated Contracts and the Designated Leases.

31.     The technical requirements for assumption and assignment of the Designated Contracts and the Designated Leases will be satisfied. In particular, all defaults under the Designated Contracts and the Designated Leases will be cured as required by Section 365 of the Bankruptcy Code. In addition, any bidder submitting a competing offer for the Assets will be required to submit information to show that it has the financial capability and other qualifications necessary to satisfy any and all obligations it will incur in connection with the Designated Contracts and the Designated Leases and thereby provide the non-debtor parties with adequate assurance of future performance as required by Section 365 of the Bankruptcy Code.

32.    To the extent any of the Designated Contracts or the Designated Leases contain provisions that purport to limit assignment, the Debtors request that the assumption and assignment of the Designated Contracts and the Designated Leases be permitted without regard to such provisions.  The Bankruptcy Code is designed to encourage the assignment of executory contracts and unexpired leases.  For example, Section 365(b)(2) provides that the assumption and assignment of an executory contract or unexpired lease may be achieved without the need for curing any default therein triggered by the insolvency of the debtor, the commencement of bankruptcy proceedings, the appointment of a trustee or a penalty provision triggered by the debtor's failure to perform non-monetary provisions.  *See* 11 U.S.C. § 365(b)(2)(A)-(D).   In addition, Section 365(f) provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2)" of Section 365(f).  11 U.S.C. § 365(f).  *See also In re Lil' Things, Inc.*, 220 B.R. 583, 591 (N.D. Tex. 1998) (Section 365(f)(1) "states the general rule that a trustee or debtor in possession may assign an executory contract notwithstanding 'applicable law' that prohibits assignment").

33.    Finally, pursuant to Section 365(k) of the Bankruptcy Code, the Debtors request that they be relieved from any further liability with respect to the Designated Contracts and the Designated Leases after assumption and assignment to the ultimate purchaser.  *See* 11 U.S.C. § 365(k).

**D.    The Purchaser is entitled to the protections of a "good faith purchaser" under Section 363(m) of the Bankruptcy Code.**

34.    The Debtors request that the Court find that the Purchaser is entitled to the protections of a "good faith purchaser" under Section 363(m) of the Bankruptcy Code.  Although

the Bankruptcy Code does not define a "good faith purchaser," the Fourth Circuit, construing Section 363(m), has indicated that the phrase encompasses a purchaser who buys for value, in good faith and without notice of adverse claims. *Willemain v. Kivitz*, 764 F.2d 1019, 1023-24 (4th Cir. 1985). To constitute lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." *Willemain*, 764 F.2d at 1024 (citing *In re Rock Industrial Machine Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)). *See also In re XACT Telesolutions, Inc.*, 2006 U.S. Dist. LEXIS 621, at *8 (D. Md., Jan. 10, 2006) (holding that, absent fraud, collusion or an attempt to take grossly unfair advantage of other bidders, the court will find "good faith" under Section 363 (m)).

35.    Here, the Debtors and the Purchaser negotiated the terms of the Purchase Agreement at arm's-length and in good faith. The Purchaser is not related to the Debtors, and they do not share corporate officers or directors. There is absolutely no evidence of fraud or collusion. Accordingly, the Debtors submit that the Purchaser should be afforded the protections of a good faith purchaser provided by Section 363(m) of the Bankruptcy Code. If the Purchaser is not the ultimate purchaser because the Debtors obtain approval of a higher and better offer, the Debtors will not support a sale to any other purchaser whose good faith under Section 363(m) can reasonably be doubted.

**E.    Waiver of the stay imposed under Bankruptcy Rules 6004(h) and 6006(d) is warranted under the circumstances.**

36.    Finally, the Debtors request a waiver of the 10-day stay imposed under Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure. The sale of the Assets should be concluded as soon as possible so the Debtors and their estates do not incur further

administrative rent obligations. Given the circumstances, there is ample cause for the Court to waive the 10-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d).

### Statement Pursuant to Local Bankruptcy Rule 9013-2

37.    Pursuant to Local Bankruptcy Rule 9013-2, the Debtors, in lieu of submitting a memorandum in support of this Motion, will rely solely upon the grounds and authorities set forth herein.

### Notice of Motion

38.    Notice of this Motion has been provided to the following: (a) counsel for the Debtors' pre-petition and post-petition secured lender; (b) counsel for the Official Committee of Unsecured Creditors; (c) the Debtors' 30 largest unsecured creditors; (d) the Office of the United States Trustee; (e) all counsel and parties having filed written requests for notice in these cases; (f) the non-debtor parties under the Designated Contracts and Designated Leases; (g) all parties, if any, known to have asserted any lien, claim or encumbrance on or against any of the Assets; (h) the Internal Revenue Service; and (i) the Securities and Exchange Commission. The Debtors submit that such notice is appropriate under the circumstances and that no other or further notice need be provided.

WHEREFORE, the Debtors request that the Court:

(a)    Enter an order, substantially in the form submitted herewith, granting the relief requested in this Motion; and

(b)    Grant such other and further relief as is just and appropriate under the circumstances.

Respectfully submitted,

DATE:  November 10, 2008

 /s/ C. Kevin Kobbe
C. Kevin Kobbe  (Bar No. 07968)
Shaan S. Chima  (Bar No. 28561)
DLA PIPER LLP (US)
The Marbury Building
6225 Smith Avenue
Baltimore, Maryland  21209
Telephone: (410) 580-4189
Facsimile:  (410) 580-3189
Email:  kevin.kobbe@dlapiper.com
            shaan.chima@dlapiper.com

*Counsel for the Debtors and*
   *Debtors in Possession*